IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES** | : |
| | : |
| v. | :     Case No. RDB-23-265 |
| | : |
| **IDRISSA BAGAYOKO** | : |

**MOTION TO SUPPRESS EVIDENCE
OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT**

Idrissa Bagayoko, by and through counsel, pursuant to Federal Rule of Criminal Procedure 12(b)(3), hereby moves to suppress all evidence seized in violation of the Fourth Amendment. Mr. Bagayoko respectfully requests that this motion be addressed at the evidentiary hearing currently scheduled for October 7, 2024.

The Elkton Police Department officer who initiated the traffic stop that led to the discovery of the pesticides at issue in this case unlawfully prolonged that stop in order to conduct a warrantless K9 scan of the minivan Mr. Bagayoko was driving. At the time the officer initiated the traffic stop, he had already conclusively determined that the minivan's registration plates were expired. The stop's purpose, then, was to cite Mr. Bagayoko for expired registration plates. Accordingly, the Fourth Amendment only permitted the officer to detain Mr. Bagayoko for the time reasonably necessary to execute that purpose—*i.e.*, to issue Mr. Bagayoko a citation for driving a vehicle with expired registration plates—and to conduct certain limited inquiries permitted during any traffic stop. In order to lawfully extend the stop to conduct a K9 scan of the minivan for narcotics, the officer needed reasonable articulable suspicion that drugs were in the car or consent from Mr. Bagayoko. He had neither. Accordingly, the officer prolonged the stop in violation of Mr. Bagayoko's Fourth Amendment rights, and the pesticides that were ultimately

found during the search of the minivan—along with all derivative evidence that was fruit of the Fourth Amendment violation—must be suppressed.

## FACTUAL BACKGROUND

On September 29, 2021, Elkton Police Department officer Matthew Nussle observed a minivan parked at a truck stop on Belle Hill Road in Elkton, Maryland. 9/29/21 Elkton Police Department Incident Report Form 21-002586 at 3, attached hereto as Exhibit 1. While the minivan was parked at the truck stop, Officer Nussle—a K9 handler—checked the vehicle's registration plates and discovered that they had expired. *Id.* Rather than issue a ticket upon discovery of the expired registration, Officer Nussle waited until the minivan drove out of the parking lot and conducted a traffic stop. *Id.* Officer Nussle asked for identification, and Mr. Bagayoko produced his valid Ohio driver's license. *Id.* According to the police report, Mr. Bagayoko "stated that he was travelling from DC to New York with a load of 'African items.'"[1] *Id.* He identified the passenger, Seydou Dembele, as his nephew.[2] *Id.* Officer Nussle reports that he then spoke with Mr. Dembele, who identified himself through a Mali passport. *Id.* Mr. Dembele said that he and Mr. Bagayoko were travelling from New York to Philadelphia. *Id.* Mr. Dembele referred to Mr. Bagayoko as his "pops" but said they were not related. *Id.* According to Officer Nussle, he "was

---

[1] Neither the officer's initial conversation with Mr. Bagayoko and the passenger nor the eventual K9 scan of the minivan was recorded on body worn camera. Instead, the officer did not activate his body worn camera until just before he began searching the minivan.

[2] As explained in more detail in Mr. Bagayoko's motion to suppress his post-arrest statements, English is not Mr. Bagayoko's first language. The recordings of law enforcement officers' conversations with Mr. Bagayoko in this case demonstrate that, more often than not, Mr. Bagayoko misunderstands questions directed to him in English and struggles to respond. The same is true for Mr. Dembele. Mr. Dembele is not Mr. Bagayoko's nephew in the traditional American English understanding of that relationship. However, Mr. Bagayoko has a very close relationship with Mr. Dembele's mother such that he considers her his "sister," which is why he referred to Mr. Dembele as his "nephew."

able to see multiple cardboard boxes in the rear hatch area that were all taped shut." *Id.* At that point, Officer Nussle "deployed K9 Mauser to conduct a scan of the vehicle for possible CDS." *Id.* Officer Nussle wrote in his report that K9 Mauser positively alerted on the driver's side corner of the rear hatch of the minivan. *Id.* A search of the vehicle yielded 18 boxes, each containing 96 bottles of Sniper DDVP, the anti-roach and insect pesticide that Mr. Bagayoko is charged with unlawfully possessing. *Id.* at 3-4. No drugs were found in the minivan or on the occupants. *Id.*

In August 2023, the Grand Jury returned a two-count indictment against Mr. Bagayoko. ECF No. 1. Count One alleges that Mr. Bagayoko illegally distributed and sold an unregistered pesticide, in violation of the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq*. *Id.* Count Two alleges that Mr. Bagayoko recklessly violated transportation safety regulations promulgated pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 and 5124, for failing to have shipping papers required to transport hazardous substances. *Id.*

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (internal quotation omitted). Reasonableness is "measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Under *Terry v. Ohio*, 392 U.S. 1 (1968), a traffic stop is reasonable "(1) if the stop was legitimate at its inception and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations and citations omitted).

"A lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission'" of the stop. *Id.* at 209-210 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (alteration in original). In other words, "[t]he permissible duration of a traffic stop 'is determined by the seizure's mission—to address the traffic violation that warranted the stop,' meaning that it may 'last no longer than is necessary to effectuate that purpose.'" *Id.* at 210 (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). An officer's "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Rodriguez*, 575 U.S. at 354. To assess whether the length of a stop is reasonable, the Fourth Circuit "conduct[s] a contextual review to determine 'whether the detention lasted longer than was necessary, given its purpose.'" *United States v. Podbielski*, No. 22-4084, 2023 WL 4888866, at *6 (4th Cir. Aug. 1, 2023) (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)).

In addition to the tasks necessary to effectuate the purpose of a traffic stop, an officer may conduct "'ordinary inquiries incident to' traffic stops, including 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 355). However, "a dog sniff around the vehicle's perimeter for the purpose of detecting narcotics 'is not an ordinary incident of a traffic stop.'" *Bowman*, 884 F.3d at 210 (quoting *Rodriguez*, 575 U.S. at 355-56). Therefore, absent reasonable suspicion to believe that drugs are in a vehicle (or consent), an officer may not perform a K9 scan of a vehicle's perimeter if it "'prolongs'—*i.e.*, adds time to—'the stop.'" *Rodriguez*, 575 U.S. at 357 (quoting *Caballes*, 543 U.S. at 407). That prolonged detention violates the detainee's Fourth Amendment rights even if only for "a *de minimis* period of time." *Bowman*, 884 F.3d at 210.

**ARGUMENT**

Officer Nussle initiated the traffic stop in this case after he had already determined that the registration plates on the minivan Mr. Bagayoko was driving had expired. Ex. 1 at 3. Therefore, Officer Nussle only had the authority to detain Mr. Bagayoko for as long as it reasonably should have taken to (1) cite him for that violation and (2) conduct any of the "ordinary inquiries" permitted during any lawful traffic stop (like checking Mr. Bagayoko's license and proof of insurance and checking for any outstanding warrants). *Rodriguez*, 575 U.S. at 354; *Bowman*, 884 F.3d at 209-10; *Williams*, 808 F.3d at 245-46; *Podbielski*, 2023 WL 4888866, at *5. Rather than pursuing that purpose, Officer Nussle abandoned it and embarked on an unfounded narcotics investigation for which there was no reasonable articulable suspicion. And because that narcotics investigation necessarily prolonged the stop, Officer Nussle violated Mr. Bagayoko's Fourth Amendment rights. Accordingly, all evidence seized from Mr. Bagayoko's minivan—and all evidence that was derived from the unconstitutionally prolonged stop—must be suppressed.

**I.    Officer Nussle Abandoned the Purpose of the Stop and Prolonged it in Order to Conduct a K9 Scan**

Officer Nussle initiated a traffic stop after he had observed that Mr. Bagayoko was driving a vehicle with expired registration plates. "Thus, he was permitted to detain [Mr. Bagayoko] to expeditiously decide whether to issue him a traffic ticket and to complete ordinary inquiries related to the stop." *United States v. Teasley*, No. 3:22-cr-00083-FDW-DCK, 2023 WL 2599019, at *5 (W.D.N.C. Mar. 22, 2023); *see Rodriguez*, 575 U.S. at 354 ("Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose.' . . . [I]n determining the reasonable duration of a stop, 'it is appropriate to examine whether the police diligently pursued the investigation.'") (first quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983), then quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)) (alterations omitted). Because

5

Officer Nussle had already determined, before initiating the stop, that the registration plates on the minivan had expired, there was no investigation left to be done during the stop itself. The Fourth Amendment, therefore, permitted Officer Nussle to detain Mr. Bagayoko in order to write him a citation for driving a vehicle with expired registration plates, conduct the ordinary inquiries incident to all traffic stops, *and nothing more* unless reasonable suspicion arose, or he obtained Mr. Bagayoko's consent. *Williams*, 808 F.3d at 245-46 ("To extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion or receive the driver's consent.") (quotation marks omitted).

Officer Nussle's police report does not make mention of *any* steps he took to pursue the original purpose of the traffic stop. Instead, after asking for their identification documents and brief additional conversation about where Mr. Bagayoko and Mr. Dembele were travelling, Officer Nussle deployed K9 Mauser to embark on a narcotics investigation. When he deployed K9 Mauser, Officer Nussle abandoned the original mission of the stop. *See Teasley*, 2023 WL 2599019, at *5-6 (granting a motion to suppress after finding an officer abandoned the stop's original purpose); *see also United States v. Digiovanni*, 650 F.3d 498, 508-09 (4th Cir. 2011) (recognizing that the Fourth Amendment does not permit an officer, absent reasonable suspicion or consent, to "definitively abandon[] the prosecution of the traffic stop and embark[] on another sustained course of investigation") (quotation marks omitted), *abrogated in part on other grounds by Rodriguez*, 575 U.S. 348. By abandoning the original purpose of the stop in order to conduct the K9 scan, Officer Nussle, by definition, "prolong[ed]—*i.e.*, add[ed] time to—the stop" because the time he used to conduct the K9 scan could have been (but was not) used to further the initial purpose of the stop. *Rodriguez*, 575 U.S. at 357 (quotation marks omitted).

6

According to the police report, approximately 9 minutes elapsed between the time Officer Nussle observed the minivan parked in the parking lot of the truck stop and the time he deployed K9 Mauser to conduct a scan of the vehicle. Ex. 1 at 3. And according to the body camera video (which began after the K9 scan), the stop ended with Mr. Bagayoko's and Mr. Dembele's arrests approximately 1 hour and 11 minutes after Officer Nussle observed the minivan parked at the truck stop. What matters here, though, is not the actual length of the stop; what matters is that Officer Nussle prolonged the stop by abandoning its original mission and choosing to conduct a K9 scan. That choice, by definition, added time to the stop because the time it would have taken to complete the stop's mission *and* conduct a K9 scan is necessarily longer than the time it would have taken to complete the stop's mission without conducting the K9 scan. Accordingly, the K9 scan here "measurably extend[ed] the duration of the stop." *Rodriguez*, 575 U.S. at 354-55 (quotation omitted); *Podbielski*, 2023 WL 4888866, at *5. The Supreme Court has made clear that prolonging a stop without reasonable suspicion or consent for *any* amount of time—even a *de minimis* amount of time—violates the Fourth Amendment. *Rodriguez*, 575 U.S. at 354-55; *Bowman*, 884 F.3d at 210; *Williams*, 808 F.3d at 245-46; *Podbielski*, 2023 WL 4888866, at *5.

## II. Officer Nussle Did Not Have Reasonable Suspicion or Mr. Bagayoko's Consent to Conduct a K9 Scan of the Minivan

"To extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess reasonable suspicion or receive the driver's consent." *Williams*, 808 F.3d at 245-46 (internal quotations omitted). "To show the existence of reasonable suspicion, 'a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot.'" *Bowman*, 884 F.3d at 213 (quoting *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008)). "[T]he relevant facts articulated by the officers and found by the trial court, after an appropriate

7

hearing, must 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Williams*, 808 F.3d at 246 (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)). There must be "a particularized and objective basis for suspecting legal wrongdoing." *Bowman*, 884 F.3d at 213 (quoting *Williams*, 808 F.3d at 246).

Officer Nussle had neither Mr. Bagayoko's consent to conduct a K9 scan of the minivan, nor reasonable suspicion that drugs were in the vehicle. After Officer Nussle initiated the stop, the facts recounted in the police report are that: (1) Mr. Bagayoko and Mr. Dembele both produced identification documents when asked; (2) Mr. Bagayoko said he was travelling with his "nephew" from Washington, DC to New York with a load of "African items"; (3) Mr. Dembele—who said he and Mr. Bagayoko were not related—said they were travelling from New York to Philadelphia; and (4) Officer Nussle saw "multiple cardboard boxes in the rear hatch area that were all taped shut." Ex. 1 at 3. None of that—whether viewed independently or in its totality—amounts to a "particularized and objective basis" to believe that drugs were in the car. *Williams*, 808 F.3d at 246.

First, while Mr. Bagayoko's and Mr. Dembele's statements about where they were going were different, they were not inconsistent with each other. They had travelled from New York to Washington, DC and were on their way from Washington, DC to Philadelphia before returning home to New York. Thus, both of their responses were accurate. But even assuming the statements initially seemed inconsistent, or incomplete, to Officer Nussle, he easily could have clarified the apparent inconsistency with a simple follow up question. *See United States v. Pacheco*, No. 23-cr-00070-NYW, 2024 WL 709789, at *11 (D. Colo. Feb. 21, 2024) ("Without further development, this potential discrepancy 'can readily be explained and is so innocent or susceptible to varying interpretations as to be innocuous.'") (quoting *United States v. Salzano*, 158 F.3d 1107, 1113 (10th

Cir. 1998)). A follow up question to clarify that apparent inconsistency was especially important given the language barrier that should have been immediately apparent to Officer Nussle. *See United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004) (finding no reasonable suspicion to justify a prolonged traffic stop, in part, because "inconsistent and limited details about [the defendant's] trip were consistent with the language barrier that existed between him and" the police officer). And even if Officer Nussle had not been able to clarify the seemingly inconsistent statements after follow-up questions, that purported inconsistency cannot establish reasonable articulable suspicion to believe that narcotics were in the vehicle—either on its own or in combination with seeing boxes in the back of the minivan. *See, e.g.*, *id.* (finding no reasonable suspicion based on: (1) air fresheners placed in several vents of the car; (2) the driver seeming "extremely nervous"; (3) the driver providing "inconsistent and limited details about his trip," and (4) the officer learned from a law enforcement database that the driver had been "flagged" in an "INS computer" and that "DEA had participated in a cocaine transaction at [his] home address," but the officer did not follow up on that information by calling the number provided by the database to obtain more information).

Second, Officer Nussle did not have reasonable suspicion to justify the K9 scan based on his observation of "multiple cardboard boxes in the rear hatch area that were all taped shut." Ex. 1 at 3. In *United States v. Karam*, the United States Court of Appeals for the Tenth Circuit found that the "the presence of neatly packaged cardboard boxes in the back of a vehicle is one of those circumstances 'so incorrigibly free of associations with criminal activity' that '[d]eference to law enforcement officers [is] inappropriate.'" 496 F.3d 1157, 1163 (10th Cir. 2007) (quoting *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005)) (alterations in original). The *Karam* court held that even when combined with other facts at issue in that case (facts which the court ultimately

9

found *did* amount to reasonable suspicion), the presence of cardboard boxes "contribute[d] nothing to the reasonable suspicion analysis." *Id.* The same is true here.

### III. The Pesticides Found During the Search, and All Derivative Evidence, Must Be Suppressed

The Fourth Circuit has repeatedly held that when a law enforcement officer prolongs a traffic stop to conduct a K9 scan without reasonable suspicion, the appropriate remedy is to suppress any evidence found during the prolonged detention. *See Podbielski*, 2023 WL 4888866, at *11; *Bowman*, 84 F.3d at 219; *Williams*, 808 F.3d 240; *Digiovanni*, 650 F.3d at 501; *see also United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007) ("Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations.").

In addition to suppressing the pesticides and any other direct evidence, all evidence that derived from the violation of Mr. Bagayoko's Fourth Amendment rights must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963) (establishing the rule that evidence that is derivative of illegal police conduct is suppressed as "fruit of the poisonous tree"). That evidence includes, but is not limited to, Mr. Bagayoko's statements to law enforcement officers about the pesticides.

\*            \*            \*            \*

Almost immediately after initiating a traffic stop for driving a car with expired registration plates, Officer Nussle decided to embark on an unfounded and warrantless narcotics investigation. That investigation necessarily prolonged Mr. Bagayoko's detention because Officer Nussle stopped pursuing the original mission of the traffic stop and, instead, conducted a K9 scan of the vehicle. But nothing Officer Nussle observed before deploying K9 Mauser gave him any reason to suspect that there were narcotics in the minivan (and, of course, no drugs were found). Instead,

what he observed were two African men who struggled to communicate in English and happened to have cardboard boxes in the back of their vehicle. That does not amount to reasonable articulable suspicion that narcotics were in the vehicle. Because he had neither reasonable suspicion nor Mr. Bagayoko's consent, Officer Nussle violated Mr. Bagayoko's Fourth Amendment rights by prolonging his detention to conduct a K9 scan. Therefore, the pesticides that were found during the search of the minivan—and all derivative evidence—must be suppressed.

## CONCLUSION

For the foregoing reasons, and any others explained in Mr. Bagayoko's reply brief, and at the October 7, 2024 motions hearing, Mr. Bagayoko respectfully requests that this Court enter an order suppressing all of the pesticides that were found in the minivan he was driving, and all evidence that derived therefrom, including but not limited to Mr. Bagayoko's statements to law enforcement officers about the pesticides.

Respectfully submitted,

JAMES WYDA
Federal Public Defender for the District
of Maryland

_____/s/_____
Sasha Garcon
Jonathan Hettleman
Assistant Federal Public Defenders
100 South Charles Street, Tower II, 9th Floor
Baltimore, Maryland 21201
(410) 962-3962 (phone)
(410) 962-0872 (fax)
sasha_garcon@fd.org
jonathan_hettleman@fd.org